IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JUSTIN L. COOPER,

Plaintiff,

vs.

ANDREW M. SAUL,[1] Commissioner
of the Social Security Administration,

Defendant.

8:18-CV-409

MEMORANDUM AND ORDER

The plaintiff, Justin Cooper, filed his Complaint (filing 1) seeking judicial review of the Commissioner's denial of his application for disability insurance benefits, and moved this Court for an order reversing the Commissioner's final decision. Filing 11. The Commissioner filed his motion to affirm the agency's final decision denying benefits. Filing 17. The Court finds that the Commissioner's decision is supported by substantial evidence on the record, that the Commissioner's motion to affirm should be granted, and that the plaintiff's motion for reversal should be denied.

I. FACTUAL BACKGROUND

1. MEDICAL AND WORK HISTORY

In early 2003 (or perhaps 2001),[2] the plaintiff was an infantryman in the Army when he suffered a concussion as a result of being thrown around in the

---

[1] Andrew M. Saul is now the Commissioner of the Social Security Administration and will be automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

[2] There is also an indication in the Veterans Affairs medical records that the plaintiff's injury was sustained in November 2002. Filing 9-6 at 20.

back of a transport truck. Filing 9-3 at 67. He was medically discharged from the Army in May 2003. After his discharge, the plaintiff worked for a short time as a cable installer, and then as a stocker at a retail home improvement store. Filing 8-7 at 27. In July 2006, Pottawattamie County, Iowa hired the plaintiff to work as a jail detention officer. Filing 8-7 at 27, filing 8-5 at 20.

Reports indicate that in October 2013, the plaintiff sustained a work-related injury to his low back. See filing 9-2 at 4; filing 9-7 at 35. The nature and extent of that injury, as well as its resolution, are not developed in this record. In 2014, the plaintiff appears to have started receiving primary medical care at Lifecare Family Medicine of Bellevue. Filing 9-1 at 34. An encounter note, dated July 9, indicates that the plaintiff experienced non-cardiac chest pain symptoms. Filing 9-1 at 36. Also noted in this report are the plaintiff's then-existing chronic conditions: ulcerative colitis and gastroesophageal reflux disease. The encounter note did not indicate that the plaintiff was experiencing low back dysfunction or pain symptoms, and neither was there an indication that the plaintiff reported neck pain or cervical dysfunction symptoms. In fact, the nurse practitioner who conducted the examination reported that there were no joint mobility abnormalities in the cervical spine or neck. Filing 9-1 at 35. The plaintiff returned to Lifecare Family Medicine several times in 2015, and on each occasion reported a specific concern, none of which involved any of the conditions pertinent to his disability claim. Dr. Brian Finley was the physician of record for each of these 2015 occasions. Filing 9-1 at 27-33.

The plaintiff applied for benefits with the Department of Veterans Affairs regarding his service-related injury. He was examined on January 19, 2016, by Dr. Judson Jones, who reported findings regarding the plaintiff's

cervical spine and right shoulder.[3] Filing 9-6 at 19-29. Regarding the plaintiff's cervical spine, Dr. Jones reported complaints of pain both midline and to the left, which Dr. Jones rated as mild. There were also complaints of intermittent left arm radiculopathy with paresthesia that could radiate into his hand, and headaches that the plaintiff associated with his neck pain. There was a decrease in the plaintiff's cervical range of motion with pain in all directions. But testing showed that the plaintiff had normal arm, wrist, and finger strength, normal reflexes, and no muscle atrophy. A radiology study was deemed unremarkable and indicated normal cervical spine alignment. Dr. Jones' evaluation of the plaintiff's right shoulder was similar in that the plaintiff expressed pain and a decreased range of motion due to pain, but the plaintiff was able to perform repetitive use testing, exhibited normal strength, and exhibited no muscle atrophy. Filing 9-6 at 29-38. A radiology report indicated that the plaintiff's right shoulder showed no evidence of fractures or dislocation, and was within normal limits. Filing 9-6 at 39.

Also in connection with his application for Veterans Affair's benefits, on May 23, 2016, the plaintiff's mental health was evaluated by clinical psychologist Dr. John Engler. Filing 9-6 at 9-18. Dr. Engler diagnosed the plaintiff with posttraumatic stress disorder (PTSD). Dr. Engler reported that there were no additional mental disorders present, and specifically reported that there was no diagnosis of traumatic brain injury. Filing 9-6 at 9-10. The mental status section reported that the plaintiff described his mood as anxious and agitated, he had trouble sleeping, he had no social interaction except for church on Sunday, and believed that his PTSD made him withdrawn. Filing 9-6 at 11-13. Dr. Engler found that the plaintiff's insight and judgment were

_____

[3] The plaintiff was also evaluated for hearing loss and gastroesophageal reflux disease, but those conditions are not pertinent to this Court's consideration of the plaintiff's complaint.

within normal limits, but that he had marked diminished interest in significant activities, feelings of detachment from others, irritable behaviors, angry outbursts, and sleep disturbance. Filing 9-6 at 13, 16. Dr. Engler found the plaintiff to be pleasant and open. He easily engaged in responding to Dr. Engler's questions. Dr. Engler found the plaintiff to be cooperative but brief with his responses, and appeared to be of above average intellectual ability. Filing 9-6 at 16-17.

Prior to Dr. Engler's evaluation, on April 18, 2016, the plaintiff was evaluated by psychiatrist Dr. Eugene Oliveto. Filing 9-2 at 55. The record is not clear whether this evaluation was connected to the plaintiff's Veterans Affairs disability application. Dr. Oliveto's notes are handwritten and hard to follow, but it appears that he diagnosed the plaintiff with PTSD resulting from his service-related injury. *Id*. It also appears that Dr. Oliveto diagnosed the plaintiff as suffering from depression and anxiety, and found that he was preoccupied with his injuries. Filing 9-2 at 56-57. It appears that Dr. Oliveto rated the plaintiff's PTSD disability at 60 percent, but there is no explanation why, or for what purpose, this rating was included in the evaluation. Filing 9-2 at 57.

On August 15, 2016, the plaintiff was seen by Dr. Finley regarding the transfer of his chronic care. Filing 9-1 at 23-25. On this occasion, the plaintiff reported that his service-connected injury was a traumatic brain injury experienced in 2001, in which he also suffered multiple fractures of his right shoulder and a neck injury. Filing 9-1 at 23. The plaintiff reported that he experienced migraines since the 2001 accident, and that a migraine could be brought about by turning his neck a certain way. The plaintiff also reported that he sustained a left foot injury sometime in 2001. Dr. Finley informed the plaintiff that he did not believe the plaintiff's headache symptoms were

migraine headaches. Filing 9-1 at 25. Dr. Finley noted that the plaintiff was trying to get Veterans Affairs to reevaluate the relationship of his headaches to his 2001 service-connected injury.

The plaintiff reported sustaining an injury to his low back while at work on September 23, 2016. Filing 9-7 at 37; filing 9-2 at 4. This injury was caused by the plaintiff repeatedly bending over to pick up a pint container of milk to place on a tray. The plaintiff reported aggravating his low back condition while at work on September 28 when he tried to pull open a door that was jammed. Filing 9-7 at 59. The first report of any evaluation or treatment for these injuries is dated October 4, 2016, when the plaintiff returned to see Dr. Timothy Burd at Nebraska Spine and Pain Center, the orthopedic surgeon who treated the plaintiff's 2013 work-related low back injury. Filing 9-2 at 39-44. Dr. Burd reported that the plaintiff complained of low back pain, bilateral leg pain more right than left, and numbness in the bottom of his feet, again more right than left. Dr. Burd believed that the plaintiff's symptoms indicated a flare-up of his 2013 injury. Dr. Burd noted that the plaintiff's existing diagnoses included depression, anxiety, and PTSD, but signs and symptoms of those conditions were not evident on this occasion.

Dr. Burd ordered an MRI of the plaintiff's lumbar spine and released him to return to work without restrictions. Filing 9-2 at 44-45. The MRI report indicated that the plaintiff's lumbar spine was essentially normal at all levels except L5-S1, which showed disc desiccation with mild loss of disc height, minimal disc bulge, a tiny right eccentric subarticular disc protrusion not displacing the adjacent nerve root, and no significant spinal canal stenosis. Filing 9-2 at 51. Dr. Burd thought the MRI results showed that the plaintiff's low back condition was basically unchanged from 2014. Filing 9-2 at 38. Dr. Burd offered to prescribe a course of physical therapy, but the plaintiff

declined, and instead, elected to restart a home exercise program, which ostensibly was a program used to rehabilitate his low back condition in 2014.

Over the next two weeks, the plaintiff called Dr. Burd's office reporting that his medications were not giving him relief from pain or from the spasms he was experiencing. Filing 9-2 at 5. Dr. Burd referred the plaintiff for an interlaminar epidural steroid injection at L5-S1, which was performed on October 25. Filing 9-2 at 36-37. At a follow-up visit with Dr. Burd on November 8, the plaintiff reported receiving significant relief from the steroid injection for a day or two, but after that, his pain returned worse than before. Filing 9-2 at 31-34. Dr. Burd noted that the plaintiff exhibited signs of depression but not anxiety. Because the plaintiff was on narcotics for pain relief, he was taken off work at the county detention facility until his next medical visit. The plaintiff was referred for an electromyography (EMG) evaluation, which was performed on November 23. Filing 9-2 at 48. The result of the examination was reported as a normal right lower extremity electrodiagnostic examination. The plaintiff returned to Dr. Burd on November 29, reporting constant pain described as shooting and sharp. Filing 9-2 at 27-29. Dr. Burd referred the plaintiff for physical therapy, three times a week for four weeks, and authorized his return to work at light duty to see if he could tolerate it. Filing 9-2 at 29-30.

While receiving care for his low back condition, the plaintiff continued receiving mental health care and counseling from Dr. Oliveto. In his note dated November 16, 2016, Dr. Oliveto reported on the medications that he had prescribed to treat the plaintiff's mental health conditions. Filing 9-2 at 59. Additionally, Dr. Oliveto reported that the plaintiff was taking hydrocodone for his low back pain condition, which was not prescribed by Dr. Oliveto (but likely prescribed by Dr. Burd). Dr. Oliveto, however, did not note anything

about complaints of pain. Also included in the note was Dr. Oliveto's comment that a letter he wrote only got the plaintiff 10 percent—which was likely a reference to his Veterans Affairs disability application.

The plaintiff returned to Dr. Oliveto on December 20 for a medication check. Dr. Oliveto noted that the Adderall prescription has worked, and that he completed paperwork for the plaintiff's disability. Filing 9-2 at 58. The paperwork Dr. Oliveto referenced was a Veterans Affairs PTSD disability benefits questionnaire in which he identified that the plaintiff suffered from PTSD, major depressive disorder, and pain disorder associated with both psychological factors. Filing 9-7 at 17. To complete the questionnaire, Dr. Oliveto identified signs and symptoms that the plaintiff exhibited by checking boxes on the form. Among the signs and symptoms that Dr. Oliveto identified were: depressed mood, anxiety, panic attacks more than once a week, chronic sleep impairment, memory impairment, flattened affect, impaired judgment, difficulty adapting to stressful circumstances, and impaired impulse control. Filing 9-7 at 21.

On January 25, 2017, the plaintiff was seen, first by Dr. Oliveto (filing 9-2 at 58), and then later was re-evaluated regarding his Veterans Affairs disability claim by Dr. Engler (filing 9-7 at 24-31). Dr. Oliveto's visit was primarily a medication check, in which he also noted that the plaintiff was told to not return to work. Dr. Oliveto advised the plaintiff to apply for Social Security disability. Dr. Engler reported reviewing the PTSD disability benefits questionnaire completed by Dr. Oliveto along with other records. Filing 9-7 at 30. Dr. Engler concluded that the plaintiff met the DSM-V criteria for a diagnosis of PTSD with depression and anxiety. Dr. Engler noted that the plaintiff exhibited symptoms of mild memory loss, disturbance of motivation

and mood, difficulty in establishing effective work and social relationships, and difficulty adapting to stressful circumstances. Filing 9-7 at 29-30.

On January 26, 2017, Dr. Burd authorized the plaintiff's return to work, limiting him to light duty with no excessive or repetitive bending, twisting, or stooping, and with the ability to change positions as needed for comfort. Filing 9-2 at 26. Dr. Burd also limited the plaintiff to no more than 12 hours and 20 minutes per shift, and ordered that he may only work Master Control. The plaintiff's next visit with Dr. Burd was January 31, 2017. Filing 9-2 at 21-24. The plaintiff reported receiving no benefit from the physical therapy that Dr. Burd had ordered in November. Dr. Burd noted that the plaintiff was presenting with signs of depression, anxiety, and sleep disturbances, but no suicidal thoughts. He characterized the plaintiff's pain symptoms as severely debilitating, and suggested that the plaintiff undergo an anterior lumbar fusion at L5-S1. In a work status report dated March 2, 2017, Dr. Burd continued the plaintiff's light duty and other work restrictions. Filing 9-2 at 20.

On February 22, the plaintiff was seen by Dr. Oliveto for his monthly medication check. Filing 9-2 at 63. Dr. Oliveto noted that the plaintiff reported that his "disc is out and he is working 84 hours every two weeks." In a return visit on March 23, Dr. Oliveto reported that the plaintiff was still struggling at his jail job because of severe pain, and that the "VA psychologist denied him 100% disability," which was upsetting for the plaintiff. *Id*. Dr. Oliveto signed a Veterans Affairs PTSD disability benefits questionnaire form for the plaintiff, which essentially replicated the same form that he completed for the plaintiff in December. Filing 9-9 at 49-54; *see* filing 9-7 at 17-22. Once again, Dr. Oliveto identified PTSD symptoms and signs that the plaintiff exhibited, and opined

that the plaintiff was completely disabled due to his PTSD symptoms. Filing 9-9 at 49-54.

On March 26, 2017, the plaintiff reported another work-related accident in which a food cart weighing around 250 pounds hit him in the back as he was standing at his locker. Filing 9-2 at 14; filing 9-7 at 59. The plaintiff reported going to the emergency room for treatment, and that he believed the emergency room physician saw something in his back.[4] Filing 9-2 at 14. The plaintiff did not return to work at the Pottawattamie County detention facility after suffering this injury. See filing 9-7 at 61. The plaintiff represented that although he was released to return to light duty work, his employer could not accommodate his work restrictions. Id.

On March 29, a Veterans Affairs physical therapist fitted the plaintiff with a single point cane and a lumbar-sacral back brace. Filing 9-3 at 42. The plaintiff returned to Dr. Burd on April 20, reporting constant low back and bilateral leg pain. Filing 9-2 at 14-19. Dr. Burd noted that the plaintiff was walking with a cane, and described his pain symptoms as the same but more intense. Dr. Burd again observed signs of anxiety, depression, and sleep disturbances. After previously suggesting a fusion surgery, now Dr. Burd was not recommending anything surgical, but instead referred the plaintiff for pain management.

The plaintiff began receiving primary care from a Veterans Affairs physician, Dr. Timothy Longacre, on April 25, 2017. Filing 9-5 at 67-73. Dr. Longacre reported that the plaintiff complained of chronic low back pain that increased with any activity and decreased with rest. The plaintiff reported that he currently was not working, and that he was involved in a workers'

---

[4] The emergency room record for this visit was not included in the plaintiff's medical records.

compensation case. Dr. Longacre's report also indicated that as of the date of his evaluation, the plaintiff's Veterans Affairs disability rating for PTSD was 70 percent. Filing 9-5 at 68. The plaintiff returned to see Dr. Oliveto, also on April 25, for a medication check. Filing 9-2 at 62. The plaintiff told Dr. Oliveto that he was on sick leave for a new injury suffered at work, that his pain was worse, and that now with the new injury, surgery was not being recommended. Dr. Oliveto observed that the plaintiff's mood and attitude were both negative.

A letter to the plaintiff from the Department of Veterans Affairs dated April 27, 2017, reports that the plaintiff's service-related PTSD disability rating was now 100 percent. Filing 8-5 at 2. The plaintiff saw Dr. Oliveto again on May 18, and reported that he was now rated 100 percent for PTSD disability. Filing 9-2 at 61. Dr. Oliveto noted that the plaintiff was still in pain and needs to look at an implanted neurostimulator. On June 22, the plaintiff presented for evaluation and treatment with physiatrist Dr. Jeremiah Ladd, Dr. Burd's colleague at Nebraska Spine and Pain Center. Filing 9-2 at 4-12. After examining the plaintiff and conducting a thorough review of the plaintiff's worker's compensation medical file, Dr. Ladd believed the plaintiff would benefit from a course of physical therapy. Filing 9-2 at 10. In addition, Dr. Ladd believed that the plaintiff's lumbar pathology did not warrant perpetuated use of narcotic-level medications. Instead, Dr. Ladd believed a component of cognitive behavioral therapy and teaching of pain coping skill may be beneficial given the plaintiff's reported persistent symptoms in the face of relatively modest lumbar MRI findings. Filing 9-2 at 11.

The plaintiff began a course of physical therapy on June 26, 2017. Filing 9-9 at 34-35. The therapist noted that the plaintiff was walking with a cane, and that pain limited his lumbar movements in all directions. The treatment the plaintiff received on the first visit consisted of joint stretching, and low

back range of motion, and lumbar stabilization exercises. The plan was for the plaintiff to receive six physical therapy visits and then transition into a work conditioning program. In a July 5 letter, the therapist advised Dr. Ladd that the plaintiff had completed six physical therapy treatment sessions and was reporting no change in his symptoms or movement tolerance. Filing 9-9 at 33. The therapist advised that he was discharging the plaintiff from physical therapy due to a lack of improvement and that the plaintiff will not be starting a work conditioning program at this time.

However, on July 20, the plaintiff was evaluated for entrance into a work hardening program at the same physical therapy facility that had discharged him just two weeks earlier. See filing 9-9 at 31-32. The program included gentle stretching, aerobic conditioning, general strengthening, and activity simulation with the goal of returning the plaintiff to light duty work. The plaintiff was to be seen three times per week, with reevaluation after two weeks. The plaintiff was reported to demonstrate limited upper extremity range of motion and strength due to a cervical injury, and significant lumbar mobility limitations, but with normal lower extremity strength. After two weeks, the plaintiff reported that he continued to have significant low back pain. He was deemed to have made only marginal improvements with low back range of motion. Filing 9-9 at 14. On Dr. Ladd's instruction, the work hardening program was continued, but increased to daily twohour sessions for another two weeks.

On August 4, two days after the start of his daily work hardening program, the plaintiff emailed his Veterans Affairs primary physician, Dr. Longacre, complaining about the "rigorous physical therapy program" a physiatrist had placed him in. Filing 9-5 at 58-59. The plaintiff claimed that his symptoms worsened after participating in the program three times a week,

but now the physiatrist had increased the sessions to five times a week. The plaintiff wrote: "This doctor is going to have me wheelchair bound by the end of this." Filing 9-5 at 59. On August 8, Dr. Oliveto noted that the plaintiff reported to be in agonizing pain. Filing 9-2 at 60. The records indicate that the plaintiff's last day in the work hardening program was August 9. Filing 9-9 at 2-4.

On October 10, 2017, Dr. Oliveto recorded a telephone interview in connection with the plaintiff's Social Security disability application. Filing 9-5 at 92-93. The narrative report details the occasions that the plaintiff was seen by Dr. Oliveto, but does not provide a description of the plaintiff's PTSD symptoms or signs. The report concludes with Dr. Oliveto opining that the plaintiff was "totally and permanently disabled and will need treatment at the VA for most of his life." Filing 9-5 at 93. It is somewhat ambiguous whether Dr. Oliveto was opining with respect to the plaintiff's Veterans Affairs disability claim, or his Social Security disability claim, or perhaps both. The plaintiff's last visit with Dr. Oliveto (as evidenced by the record) was on October 31. Filing 9-9 at 44. The treatment note for this visit primarily reports the fact that the plaintiff's care will be assumed by Veterans Affairs.

Finally, on January 25, 2018, Dr. Oliveto completed a Mental Medical Source Statement form in connection with the plaintiff's Social Security Disability application. Filing 9-8 at 48-53. Dr. Oliveto reported the same diagnoses for the plaintiff that he reported to Veterans Affairs in December 2016: PTSD, major depressive disorder, and pain disorder. Dr. Oliveto opined that the plaintiff was unable to work a full-time job due to severe and intractable pain. The form required Dr. Oliveto to rate the plaintiff's capacity to function independently in a competitive work setting. Generally, Dr. Oliveto found that the plaintiff's capacity to learn and remember was mildly affected

(performance precluded 5% of an 8-hour work day), his concentration and persistence was mild to moderately affected (performance preclusion rated 5% with some at 10%), his ability to relate and work with others was mildly affected (performance preclusion rated 5%), and his ability to adapt or manage himself was mild to moderately affected (performance preclusion rated 5% with some at 10%). Filing 9-8 at 49-51.

## 2. ADMINISTRATIVE HEARING

A hearing before an Administrative Law Judge (ALJ) was held on March 6, 2018, in which the plaintiff and a vocational expert were the only witnesses. The hearing opened with the ALJ and counsel for the plaintiff identifying that the plaintiff had a mixture of physical and mental problems, with the primary issue being the extent to which the plaintiff's PTSD affected his ability to work. Filing 8-2 at 41-42. When questioned by the ALJ, the plaintiff said that the problems that prevent him from working were PTSD, depression, and anxiety. Filing 8-2 at 47. Regarding his physical problems, the plaintiff identified back pain and "radiculopathy in my neck" that he believed was getting progressively worse. *Id.* The plaintiff also testified that in his job as a detention officer, he found himself getting forgetful, losing concentration, unable to sit at a post for a 12-hour day, and using up all his leave because he couldn't do the job. Filing 8-2 at 47-49. The plaintiff believed that his condition had gotten progressively worse since 2016. Filing 8-2 at 48

The plaintiff said he thought he could only sit in a regular office chair for five minutes before his legs started to go numb, he could stand for around twenty minutes, and walk for only fifty yards. He estimated that on a job, he would only be able to alternate sitting for five minutes and standing for twenty minutes for about an hour before he would have to lay down. Filing 8-2 at 50-

51. When asked how much weight he could lift, the plaintiff said he didn't know an exact weight. He had recently tried to lift a thirty-pound bag of cat food but couldn't hang on because of his lack of hand strength. Filing 8-2 at 52. The ALJ asked what kind of treatment he was currently receiving, and the plaintiff said he was waiting for the VA to provide chiropractic treatment. Filing 8-2 at 53. When asked what he does with his time during most of the day, the plaintiff said he is constantly having suicidal ideations, and finds himself playing games on his phone for most of the day. Filing 8-2 at 56.

When questioned by his counsel, the plaintiff said he had panic attacks at least three or four times a day. Filing 8-2 at 60-61. When asked a second time about the frequency of panic attacks, the plaintiff said: "Five or six a day, sometimes more." Filing 8-2 at 61. The plaintiff estimated that he got three or four hours of sleep at night, and had the same nightmare every night about being thrown around in the back of a truck. Filing 8-2 at 62.

The ALJ asked the vocational expert, Stephen Schill, to address the following hypothetical.

> [A]ssume an individual with the claimant's same age, education, and past work. Assume further we have an individual who can do light work, never climb ladders, ropes, or scaffolds, occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch, never crawl. Mentally go with simple and routine tasks. Occasional contact with supervisors and coworkers. No more than brief and superficial interactions with the public as part of the job duties.

Filing 8-2 at 64. Schill testified that the plaintiff's past work was ruled out, but that there were other jobs available for such person—specifically, a sorter, a photocopy machine operator, and a cleaner. Filing 8-2 at 64-65. Schill was then

asked to assume that in addition, the individual would have to alternate sitting and standing fairly frequently, more or less at will, or every fifteen minutes. Schill testified that there would be no reduction in the occupational base with that added limitation. Filing 8-2 at 65. Finally, Schill was asked to consider a third limitation—that the individual could not perform work at a production pace. Schill opined that such individual would not be employable in competitive work. Filing 8-2 at 65-66. Schill said that a typical employer would tolerate one to two days off per month, and tolerate ten percent off-task time, but that competitive employers would not allow a person to take unscheduled breaks every two hours. Filing 8-2 at 67.

After the plaintiff's counsel pointed out that light duty jobs usually include the ability to stand for six hours in an eight-hour day, the ALJ asked Schill to assume an individual in the sedentary category. Filing 8-2 at 71. Schill then identified three jobs in the national labor market that would be available to such individual—a document preparer, an eyeglass frame polisher, and an addresser. Filing 8-2 at 72.

### 3. ALJ's FINDINGS AND CONCLUSIONS

On March 29, 2018, the ALJ issued an unfavorable decision, finding that the plaintiff was not disabled. Filing 8-2 at 13. To determine whether a claimant qualifies for disability benefits, an ALJ performs a five-step sequential analysis of the claim. 20 C.F.R. § 404.1520(a)(4). Regarding step one, the ALJ found that the plaintiff met the insured status requirement of the Social Security Act and that the plaintiff had not engaged in substantial gainful activity since March 29, 2017, the plaintiff's amended alleged onset date. Filing 8-2 at 18.

At step two, the medical severity of the claimant's impairment is considered. 20 C.F.R. § 404.1520(a)(4)(ii). The claimant has the burden to prove a medically determinable physical or mental impairment or combination of impairments that significantly limits the physical or mental ability to perform basic work activity. *Gonzales v. Barnhart,* 465 F.3d 890, 894 (8th Cir. 2006). The ALJ found the following severe impairments: degenerative disc disease of the lumbar spine, depression, and post-traumatic stress disorder. Filing 8-2 at 18. Additional conditions that the plaintiff alleged were disabling were rejected as such by the ALJ. Those conditions included: scapular bursitis; ulcerative colitis; tension headaches; cervical spine strain; radiculopathy of the upper extremities; left foot pain; attention deficit hyperactivity disorder (ADHD), and traumatic brain injury. Filing 8-2 at 19-20. The ALJ concluded that the evidence did not support a finding that these conditions contributed a functional limitation, and, regarding the traumatic brain injury claim, that there was no objective medical evidence in the record showing that a traumatic brain injury had ever actually been diagnosed.[5] The ALJ acknowledged that non-severe impairments may affect an individual's residual functional capacity, and represented that the effects of all conditions would be considered when evaluating the plaintiff's residual functional capacity. Filing 8-2 at 20.

At step three, the medical severity of the claimant's impairments is considered. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairments meet or equal a presumptively disabling impairment listed in the regulations, the analysis ends, and the claimant is automatically found disabled and entitled to benefits. *Gonzales,* 465 F.3d at 894. The ALJ acknowledged that the plaintiff did not claim that any of his impairments met or medically equaled a listing.

---

[5] The plaintiff reported to several of his treating physicians that he suffered a traumatic brain injury but no record of the actual diagnosis can be found in the plaintiff's medical records.

Filing 8-2 at 21. Still, the ALJ went ahead and evaluated the medical evidence in reference to listings 1.04 (disorders of the spine), 12.01 (depressive disorders), and 12.15 (post-traumatic stress disorder), and found that the plaintiff's conditions did not meet or equal the criteria in each listing.

When a claimant's impairments do not meet or equal a listing, an assessment is made of the claimant's residual functional capacity based on all relevant medical and other evidence in the record. 20 C.F.R. § 404.1520(e). When considering a claimant's residual functional capacity, all medically determinable impairments in the record are assessed, even ones not deemed severe. 20 C.F.R. § 404.1545(a)(2).

The ALJ reported finding that "after careful consideration of the entire record," the plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), with the following additional limitations: only simple or routine tasks; only brief and superficial interactions with the public and occasional interaction with coworkers and supervisors; occasionally climbing stairs and ramps; occasional balancing, stooping, kneeling and crouching; avoid climbing ladders, ropes and scaffolds; and avoid crawling. Filing 8-2 at 23. The ALJ concluded there was objective medical evidence that the plaintiff's lumbar degenerative disc disease, depression, and PTSD were severe impairments that could reasonably be expected to produce the plaintiff's symptoms. But that the plaintiff's statements regarding intensity, persistence, and the limiting effects of his symptoms were not entirely consistent with the medical and other evidence in the record. Filing 8-2 at 24.

At step four, a claimant has the burden to prove the lack of a residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv); *Gonzales,* 465 F.3d at 894. The ALJ determined that based on the plaintiff's residual functional capacity, he was unable to return to his

past relevant work, which involved medium, heavy and very heavy exertion. Filing 8-2 at 28.

At step five, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform considering the claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v); *Gonzales,* 465 F.3d at 894. The ALJ determined that based on his age, education, work experience and residual functional capacity, the plaintiff retained the capacity to perform the requirements of unskilled, light exertional occupations that existed in significant numbers in the national economy. Filing 8-2 at 28-29. In so doing, the ALJ found the testimony of the vocational expert persuasive regarding the light duty jobs identified at the hearing. Filing 8-2 at 29.

On May 21, 2018, the plaintiff filed a request for review of the ALJ's unfavorable decision. Filing 8-4 at 62-63. On June 28, 2018, the Appeals Counsel denied the plaintiff's request for review. Filing 8-2 at 2-4. The ALJ's March 29, 2018, decision is now the final administrative order.

## II. STANDARD OF REVIEW

The Court reviews "the ALJ's decision to deny disability insurance benefits de novo on the record to ensure that there was no legal error and that the findings of fact are supported by substantial evidence on the record as a whole." *Combs v. Berryhill*, 878 F.3d 642, 645-46 (8th Cir. 2017). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support a conclusion." *Id.* The Court considers "the record as a whole, reviewing both the evidence that supports the ALJ's decision and the evidence that detracts from it." *Id.* The Court will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue,* 648 F.3d 892, 897 (8th Cir. 2011). If,

after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id.* The Court reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). The Court defers to the ALJ's determinations regarding credibility so long as such determinations are supported by good reasons and substantial evidence. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).

## III. DISCUSSION

### 1. FAILURE TO CONSIDER THE COMBINED EFFECTS OF ALL IMPAIRMENTS AND SUPPLEMENT THE RECORD.

The plaintiff argues that his perception of pain and how it impacts his functional capacity may not be assessed by considering, as the ALJ did, only "objective medical evidence" showing mild degenerative disc disease. See filing 12 at 19. The Court disagrees with the plaintiff's characterization of how the ALJ assessed the evidence concerning the plaintiff's functional limitations. Arguably, if the "objective medical evidence" was the sole criteria used to access the plaintiff's condition, the ALJ would have had grounds to find that the plaintiff suffered no functional impairment. The MRI, X-ray, and EMG reports do not reveal a physical basis that would explain the plaintiff's reports of pain.

But yet, the plaintiff's treating orthopedic surgeon, Dr. Burd, as well as every other treating physician, psychologist, and psychiatrist, do not doubt that the plaintiff's pain perceptions affect real limits in his capacity to function. Dr. Burd and his colleague Dr. Ladd returned the plaintiff to only light duty work. Filing 9-2 at 11-13. No physician, including those retained by an insurer to provide opinions on the plaintiff's condition for the purposes of workers'

compensation litigation, opined that the plaintiff's functional capacity was greater than light duty. It is true that the plaintiff has complained of pain symptoms that have increased over time, and which have not been relieved or mitigated with narcotics and other medications. Those complaints, although not fully accepted by the ALJ, were nonetheless credited by the ALJ as significantly limiting the plaintiff's functional capacity from a medium physical demand level at the plaintiff's detention facility job, to his current light physical demand limitation. See filing 8-8 at 10. There is substantial evidence in the record supporting the ALJ's conclusion that the plaintiff's residual functional capacity is limited to a physical demand level of light duty work.

The plaintiff also argues that the ALJ should have developed the record further to show how his "potential conversion disorder" limited his ability to work. Filing 12 at 19. The ALJ undeniably has the duty to fully and fairly develop the record, independent of the plaintiff's burden to press his case. Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017). But the ALJ is not a medical expert and may not succumb to the temptation to play doctor. Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009). Here, there is no diagnosis or medical opinion in the record suggesting the plaintiff suffers from conversion disorder. Neither is there a diagnosis of somatic symptom disorder, dissociative disorder, factitious disorder, or malingering.

The record regarding the plaintiff's mental health condition was developed around his diagnoses of PTSD, depression, anxiety, and attention deficit hyperactivity disorder. Filing 8-2 at 18-20. Dr. Ladd, Dr. Oliveto, and one of the physicians retained by the workers' compensation insurer all reported that the interaction between the plaintiff's pain and his depression or PTSD, and the effect that interaction has on his functional level, needed to be

addressed. Filing 9-2 at 11; filing 9-7 at 17-22, filing 9-7 at 61-62. The plaintiff does not argue that the ALJ failed to fully and fairly develop the record with respect to the plaintiff's diagnosed mental health conditions. An ALJ must neutrally develop the facts, but does not have to seek additional clarification from a physician unless a crucial issue is undeveloped. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). Not only is a conversion disorder diagnosis absent in the medical records, the plaintiff did not list conversion disorder as a mental health condition that limited his work in his disability report, *see* filing 8-7 at 38, and conversion disorder was not identified as a condition affecting the plaintiff's functional capacity at any time during the course of the administrative hearing, *see* filing 8-2 at 41-42. An ALJ is not obligated to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability. *Mouser v. Astrue*. 545 F.3d 634, 639 (8th Cir. 2008).

## 2. WEIGHT OF THE TREATING PSYCHIATRIST'S OPINIONS

The plaintiff argues that the ALJ failed to give good reasons for the weight given to the opinions of the plaintiff's treating psychiatrist. The record reflects that Dr. Oliveto was the only psychiatrist who actually treated the plaintiff. The ALJ concluded that Dr. Oliveto's opinions were not persuasive because he did not set forth objective medical evidence in support, and his opinions were inconsistent with the opinions of the State agency psychologists. Filing 8-2 at 27-28. Additionally, Dr. Engler, a psychologist, evaluated the plaintiff in connection with his Veterans Affairs disability claim. The ALJ concluded that Dr. Engler's opinion that the plaintiff's PTSD imposed some limitations was only somewhat persuasive because it was supported by objective medical evidence, which the ALJ referenced as being "set forth

above." Filing 8-2 at 27. In contrast, the ALJ purported to find the opinions of the State agency's psychologists very persuasive because those opinions were supported by "objective medical evidence corroborating the claimant's symptoms and limitations due to PTSD, anxiety, depression, and ADHD." Filing 8-2 at 27. The ALJ did not elaborate on precisely what this "objective medical evidence" was.

The plaintiff's claim was filed on September 5, 2017. Filing 8-5 at 10. The Social Security Administration, by regulation, altered how it considered and articulated medical opinions for all claims filed after March 27, 2017. 20 C.F.R. § 404-1520c. The Eighth Circuit Court of Appeals has long held that a consulting physician's one-time examination of a claimant does not constitute substantial evidence when contradicted by the evaluation of the claimant's treating physician. See *Hancock v. Secretary of Dept. of Health, Ed. & Welfare*, 603 F.2d 739, 740 (8th Cir. 1979); *McGhee v. Harris*, 683 F.2d 256, 259 (8th Cir. 1982). Known as the treating physician rule, deference to the medical opinion of a treating source became the regulatory standard in 1991. 20 C.F.R § 404.1527(c). Now, § 404-1520c purports to overrule the treating physician rule for claims filed after the regulation took effect. The Social Security Administration can certainly cabin its administrative law judges' consideration of a claim to the Administration's regulations. But whether the Administration can dictate by regulation a federal district court's consideration of whether substantial evidence exists to support an ALJ's decision based on caselaw that substantially predates an administrative regulation is an open question that need not be addressed any further on this record.

The ALJ purported to find the opinions of the State agency psychologist very persuasive. Filing 8-2 at 27. But in assessing the plaintiff's residual

functional capacity, the ALJ identified limitations that were more restrictive than the psychologist's opinions regarding the plaintiff's capacity to function. Filing 8-2 at 23. For example, the ALJ found the plaintiff's residual functional capacity was limited to simple and routine tasks, brief and superficial interactions with the public, and occasional interactions with coworkers and supervisors. Filing 8-2 at 23.

The State agency psychologist, however, concluded that the plaintiff was not significantly limited in his ability to understand and remember detailed instruction, or his ability to make complex work decisions, or his ability to sustain an ordinary routine without supervision. Filing 8-3 at 12-13. The psychologist opined that the plaintiff was able to remember more complex instructions, ask and answer questions, recognize and correct mistakes, and follow work-related procedures. Regarding social interaction, the psychologist considered the plaintiff able to accept direction and constructive criticism from supervisors and interact with coworkers.

Instead, the limitations the ALJ attributed to the plaintiff's capacity to function showed greater consistency with the opinions, signs, and symptoms identified by Dr. Oliveto. Dr. Oliveto concluded that the plaintiff had mild memory loss, displayed difficulty understanding complex commands, showed impaired judgment, was mildly impaired in his ability to understand, remember or apply information, showed mild to moderate impairment of his ability to concentrate, and showed mild impairment of his ability to adapt or manage himself. Filing 9-7 at 21; filing 9-8 at 49-51. The ALJ reported that he found Dr. Oliveto's opinions not very persuasive, but the ALJ's findings regarding the plaintiff's residual functional capacity are nonetheless consistent with Dr. Oliveto's reports, and inconsistent with the State agency psychologist's opinions. Also, the State agency psychologist did not personally

examine and evaluate the plaintiff. Her opinions were based entirely on a review of the medical records that largely consisted of Dr. Oliveto's reports. The ALJ did not explain how the State agency psychologist's opinions could be very persuasive when they were derived entirely from a review of the treating mental health providers' findings and opinions, which the ALJ found were unpersuasive.

Moreover, the ALJ's articulated grounds for disregarding Dr. Oliveto's opinions appears to reflect a misapplication of the pertinent regulations. The ALJ found Dr. Oliveto's opinions not persuasive because they were not supported by "objective medical evidence." Filing 8-2 at 27. However, it appears as though the ALJ defines the phrase "objective medical evidence" colloquially—in other words, as a process entirely based on hard facts—and not as the phrase is defined in the regulations. "Objective medical evidence means signs, laboratory findings, or both." 20 C.F.R. § 404.1502(f).

> Signs means one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g. abnormalities of behavior, mood, thought, memory, orientation, development, or perception, and must also be shown by observable facts that can be medically described and evaluated.

20 C.F.R. § 404.1502(g).

A psychiatric diagnosis is not a process entirely based on hard facts. The signs of a mental health disorder are shown by observations that can be medically described and evaluated, which is what Dr. Oliveto provided in his

reports. The ALJ was wrong to conclude that Dr. Oliveto's opinions were not supported by objective medical evidence as that phrase is defined in the regulations. However, the ALJ was not wrong to give no weight to Dr. Oliveto's opinions that the plaintiff was totally disabled or unable to work a fulltime job. Filing 9-5 at 92-93; filing 9-8 at 48. The decision whether the plaintiff is disabled or whether there were jobs in the national economy that the plaintiff could perform is the ultimate disability determination reserved to the Commissioner. *Schwandt v. Berryhill*, 926 F.3d 1004, 1011 (8th Cir. 2019); *Perkins v. Astrue*, 648 F.3d 892, 898 (8th Cir. 2011).

The Court reviews for substance over form, and any inconsistency resulting from the ALJ's opinion-writing technique that has no bearing on the outcome will not require the Court to set aside the ALJ's findings. See *Buckner*, 646 F.3d at 559. To be sure, there is an inconsistency in the ALJ's conclusion that the opinions of the State agency psychologist were very persuasive, when those opinions were entirely based on a review of the examinations and reports of mental health providers the ALJ found not persuasive. But notwithstanding this inconsistency, there is substantial evidence in the record supporting the ALJ's findings regarding the plaintiff's residual functional capacity.

It would be possible for this Court, in the first instance, to find that the plaintiff is disabled. But if two inconsistent positions from the evidence are possible, and one of those positions represents the ALJ's findings, this Court must affirm the ALJ's decision. *Perkins,* 648 F.3d at 897. Giving due consideration to the record as a whole, the ALJ's residual functional capacity determination accounts for the plaintiff's ability to function in the work place, and considers the combined effects of the plaintiff's mental and physical impairments. *Stormo*, 377 F.3d at 807. Accordingly, the ALJ's decision shall be affirmed.

### 3. APPOINTMENTS CLAUSE.

The plaintiff raises for the first time on appeal a claim that the ALJ was an inferior officer who, pursuant to *Lucia v. SEC*, 138 S. Ct. 2044 (2018), required appointment by the President, Courts of Law, or the Commissioner.[6] Consistent with *Lucia,* the plaintiff asks that this matter be remanded and that a different ALJ be assigned to determine his claim for benefits.[7] In response, the Commissioner does not concede that Social Security ALJs are inferior officers as opposed to agency employees, and also argues that the plaintiff waived or forfeited any Appointments Clause claim by not timely raising the issue at the hearing before the ALJ or to the Appeals Council.

Appointments Clause challenges are deemed to be "in the category of non-jurisdictional structural constitutional objections that could be considered on appeal whether or not they were ruled upon below." *Freytag v. C.I.R.*, 501

---

[6] The Appointments Clause provides, in pertinent part, that the President

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. Art. II § 2, cl. 2.

[7] In *Lucia,* the matter was remanded for a new hearing before a different fact-finder. "To cure the constitutional error, another ALJ (or the Commission itself) must hold the new hearing to which Lucia is entitled." *Lucia*, 138 S. Ct. at 2055.

U.S. 868, 879-80 (1991). It strikes the Court that the doctrines of waiver and forfeiture are inapposite when it is the ALJ's responsibility to fully and fairly develop the record, independent of the plaintiff's burden to press his case. *Combs,* 878 F.3d at 646.

The problem the Court finds regarding the plaintiff's Appointments Clause challenge is that this Court reviews the ALJ's decision de novo on the record for legal error. *Combs,* 878 F.3d at 645-46. But here, there is an absence of a record regarding the plaintiff's Appointments Clause challenge because it was not raised before the ALJ. The regulations provide a process to reopen and supplement an administrative record after a final decision has been issued. 20 C.F.R. § 404.987. A claimant can reopen an ALJ's decision for any reason within twelve months from the date of the initial decision. 20 C.F.R. § 404.988.

The initial decision in this matter was dated March 29, 2018. Filing 8-2 at 30. The plaintiff filed his complaint in this matter on August 27, 2018. Filing 1. Instead of raising the Appointments Clause challenge for the first time on appeal, the plaintiff could have reopened the record and presented his claim at the administrative level. Evidence could have been adduced, and arguments could have been made, and thereby this Court would have been furnished a record to review. Had the Commissioner denied a request to reopen the ALJ's decision, that decision would have been reviewable if deemed to present a colorable constitutional claim. See *Califano v. Sanders,* 430 U.S. 99, 109 (1977); *Mitchell v. Colvin,* 809 F.3d 1050, 1055 (2016).

The plaintiff and the Commissioner have presented this Court with arguments in support of their positions, and have referenced documents that are not part of the administrative record. Those documents have not been offered and received into evidence. No court or tribunal has been asked to take judicial notice of the documents, nor have they been authenticated by the

offering party or stipulated to by the opposing party. No record has been made regarding the factors that distinguish an inferior officer from an agency employee as it pertains to a Social Security Administration administrative law judge. This Court is unwilling to assume facts and evidence regarding the ALJ's appointment, duties, and authority that are not included in a record, and will not return this matter for reconsideration based only on arguments and speculation.

## III. CONCLUSION

There is substantial evidence on the record as a whole supporting the ALJ's denial of benefits.

IT IS ORDERED:

1.  The Clerk of the Court is directed to substitute Commissioner of Social Security Andrew M. Saul as the defendant.

2.  Cooper's motion for reversal of the Commissioner's final decision (filing 11) is denied.

3.  The Commissioner's motion to affirm the Commissioner's final decision (filing 17) is granted.

4.  Cooper's complaint is dismissed.

5.  The parties shall bear their own costs.

6.  A separate judgment will be entered.

Dated this 28th day of August, 2019.

BY THE COURT:

John M. Gerrard
Chief United States District Judge